A98A2076. MILLER v. THE STATE.
(513 SE2d 27)

BEASLEY, Presiding Judge.

Miller was charged with two counts of first degree vehicular homicide under OCGA § 40-6-393 (a). Count 1 alleged that he caused the death of David Stachur through violation of OCGA § 40-6-391 (a) (1) (DUI to the extent that it was less safe to drive) by striking a bicycle being pedaled by Stachur. Count 2 accused Miller of causing Stachur's death through violation of OCGA § 40-6-391 (a) (5) (DUI with an unlawful blood-alcohol concentration). Miller was convicted on Count 1.

He challenges the sufficiency of the evidence to support the verdict, on the ground that Stachur's death was the result of unavoidable accident. He also contends that the trial court erred in refusing to charge the jurors on speeding as a predicate to the lesser included offense of second degree vehicular homicide and in refusing to recharge the jurors on the requirement of proximate cause. Third, he complains of the denial of his motion to suppress the results of a blood-alcohol test because the State did not show that the test was administered within three hours after he had driven his car. Additional issues are also raised.

At the time of the accident, Miller was 20 years old and resided with his aunt and uncle. He had one prior DUI arrest. The testimony of State's witnesses Stephanie Gresham and Tim Haler, good friends of Miller's, supported findings that, on the evening in question, Miller had been at a bar and had consumed an undetermined amount of beer. Miller gave Gresham and Haler a ride from the bar to Gresham's house when the bar closed, because Haler and Gresham had become extremely intoxicated. Both witnesses agreed Miller's driving was not normal. Haler testified that en route to Gresham's home, Miller was weaving in his lane. Gresham asked Miller to spend the night because she did not think it was safe for him to drive, but Miller declined.

As Miller was proceeding from Gresham's house to his own along Highpoint Road in a southerly direction, he encountered Stachur riding his bicycle in the middle of the road going the same way. Miller's vehicle struck the rear of the bicycle, propelling Stachur onto the

hood of the car into the windshield and resulting in his death from blunt force trauma to the head. The collision occurred in an uphill area of Highpoint Road before it curves in a southeasterly direction at its intersection with Fireplace Trail.

Miller did not stop to render assistance but rather drove home and awoke his aunt and uncle. Crying hysterically, he said he had just hit someone on a bicycle. The aunt called 911, and the uncle drove Miller to the scene in an unsuccessful attempt to find the victim. The 911 call was received at 2:52 a.m.

Gwinnett County police officer Yeager was dispatched to the scene. After an unsuccessful attempt to find the bicyclist, he followed Miller and his uncle back to their house. He observed extensive damage to the right front of Miller's vehicle and saw the shattered windshield on the passenger's side and fabric embedded in the broken windshield. Officer Yeager, who had previously thought Miller may have hit a deer, became convinced otherwise and returned to look for the victim. Stachur's body was discovered by other officers on the scene around that time.

Stachur was dressed in dark non-reflective clothing, had not been wearing a helmet, and apparently was riding the bicycle while wearing a set of Walkman headphones which were found on the ground. The bicycle displayed a rear reflector approximately one and one-half to two inches in diameter but no headlight or battery-operated light. According to Stachur's mother, he had covertly left their home that night and ridden his bicycle to his girlfriend's. Stachur's mother related that he had a habit of riding his bicycle at night and previously had been warned of the attendant dangers by the police.

According to Corporal Thaxton of the Gwinnett County Police Department, the roadway was dark, without streetlights, and there was no significant moonlight at the time of the collision. Based on his investigation, Thaxton concluded that at the moment of impact the bicycle was moving from left to right at an approximate ten- to twenty-degree angle to the shoulder of the road and was no less than six feet from the fog line of the twelve-foot-wide southbound lane. This was consistent with Miller's statement to Thaxton that the bicycle was in the middle of the lane. Although Miller also related to Thaxton that he had swerved in an attempt to avoid hitting the bicycle, Thaxton found no skid marks on the road which would have evidenced braking or other evasive action. Thaxton testified that when Miller's car was inspected by officers after the collision, the headlights were on low beam. Miller did not testify.

The speed limit was 35 mph, and Thaxton found no evidence that Miller was speeding. A car being driven at the speed limit would travel approximately 50 feet per second. According to Thaxton, the

standard reaction time for a person Miller's age is one second. Thaxton testified that at a distance of 50 feet, the reflector on Stachur's bicycle would have been "very visible," "[i]f you're looking for it," but "[i]f you're not aware it might be there, . . . there's a good chance you would miss it. . . ." He added that the visibility of the reflector would also be influenced by the angle between the bicycle and a car, so that it would be invisible at a 90-degree angle but increasingly more visible as the angle decreased. Defendant's accident reconstruction expert Hill offered his opinion that under all the circumstances the collision was unavoidable.

Officer Thaxton arrived on the scene at about 4:10 a.m. and instructed Officer Thompson to secure Miller and his vehicle. Officer Yeager returned with Thompson to Miller's residence. Thompson testified that while questioning Miller, he detected an alcohol odor and Miller acknowledged he had been drinking. Miller attempted unsuccessfully to perform a field sobriety test, and a breathalyzer administered to him registered positive for alcohol. After he verbally agreed to submit to a blood and urine test, he was transported to a medical center. Panter, a forensic chemist employed by the Georgia Bureau of Investigation, testified that the test revealed a blood-alcohol concentration of .17 grams at the time the test was administered.

Prior to having his blood drawn, Miller signed a release prepared by Bryant, the medical technologist who administered the test. Bryant stated on the release that it was executed at 5:00 a.m. He testified that this accurately reflected the approximate time Miller signed the release, and that he drew Miller's blood immediately thereafter. Officer Thompson testified that Miller signed the release at exactly 5:00 a.m. Although in his testimony Panter commented that the blood was drawn at 5:20 a.m., he acknowledged that he had no personal knowledge of the time and was relying on documents submitted to him. Afterward Thompson returned Miller to his home, arriving at 5:40 a.m.

Miller's aunt and uncle testified they did not smell any alcohol on Miller initially and he did not appear intoxicated, but when the police returned to the house after finding the victim, Miller smelled of alcohol and was acting differently. It is undisputed that Miller previously had been talking to the officers at a distance of one or two feet, and no one detected an odor of alcohol or observed any indicia of intoxication. The aunt testified that a large amount of alcohol was missing from one of their liquor bottles, and Miller admitted to her that he was drinking after the collision.

1. The first issue concerns the causation requirement of OCGA § 40-6-393 (a), which provides that any person who, "without malice aforethought, *causes* the death of another person *through* the violation of" various statutory provisions commits the offense of homicide

by vehicle in the first degree. (Emphasis supplied.) The referenced statutes are OCGA §§ 40-6-163 (a); 40-6-270 (b); 40-6-390; 40-6-391; and 40-6-395 (a), which respectively prohibit passing a parked school bus, hit and run, reckless driving, DUI, and fleeing or attempting to elude police.

In cases such as *McNabb v. State*[1] and *Watkins v. State*,[2] we have recognized that the vehicular homicide statute requires the State to establish a causal connection between the defendant's violation of the DUI or reckless driving statute and the victim's death. In this case, Miller was convicted of causing the victim's death through violation of OCGA § 40-6-391 (a) (1), which makes it unlawful for a person to drive or be in actual physical control of any moving vehicle under the influence of alcohol to the extent that it is less safe for the person to drive. It is not required that the person actually commit an unsafe act.[3] By their terms, OCGA §§ 40-6-391 (a) (1) and 40-6-393 (a) require the State to prove only that the intoxicated driver caused the victim's death as a result of driving under the influence to the extent it was less safe for him to drive.[4]

2. Nevertheless, negligence by the defendant in operating his vehicle and the behavior of the victim remain relevant. In vehicular homicide cases, the State must prove that the defendant's conduct was the "legal" or "proximate" cause, as well as the cause in fact, of the death.[5]

> If in a given case the injury complained of did not flow naturally and directly from the wrongful act or omission attributed to the defendant, or could not reasonably have been expected to result therefrom, or would not have resulted therefrom but for the interposition of some independent, unforeseen cause, the defendant's such antecedent wrongful act or omission would not be the proximate cause

---

[1] 180 Ga. App. 723, 725 (4) (350 SE2d 314) (1986).

[2] 191 Ga. App. 87, 89 (3) (381 SE2d 45) (1989).

[3] *Shelton v. State*, 214 Ga. App. 166, 168 (2) (447 SE2d 115) (1994).

[4] The majority of courts in other states which have been presented with the question have held that their vehicular homicide statutes require proof of a causal connection only between the defendant's act of driving and the victim's death rather than between the defendant's intoxication and the death. See *State v. Wong*, 125 N.H. 610, 486 A2d 262 (1984); *Felske v. State*, 706 P2d 257 (Wyo. 1985); *State v. Woodman*, 12 Kan. App. 2d 110, 735 P2d 1102 (1987); *Magaw v. State*, 537 S2d 564 (Fla. 1989); *People v. Garner*, 781 P2d 87 (Colo. 1989); *Commonwealth v. Shoup*, 620 A2d 15 (Pa. Super. 1993); *State v. Heft*, 185 Wis.2d 288, 517 NW2d 494 (1994); *State v. Rivas*, 126 Wash.2d 443, 896 P2d 57 (1995). But see *State v. Ring*, 233 Neb. 720, 447 NW2d 908 (1989); *Anderson v. State*, 774 SW2d 733 (Tex. App. 1989); *State v. Copes*, 566 S2d 652 (La. App. 1990).

[5] See *Johnson v. State*, 170 Ga. App. 433, 434 (1) (317 SE2d 213) (1984) and cits. Accord *State v. Rivas*, supra, 896 P2d at 62, citing 1 LaFave & Scott, Substantive Criminal Law, § 3.12, p. 390 (1986).

of the injury complained of. [Cits.][6]

Although contributory negligence, as such, is not a defense in a vehicular homicide case,

> the conduct of the decedent, whether negligent or not, is material to the extent that it bears upon the question of whether under all the circumstances of the case the defendant was negligent, or, if negligent, whether the decedent's negligence was the sole proximate cause of the injury, or whether the injury or death resulted from an unavoidable accident. [Cits.][7]

The trial court granted defendant's request to charge the jury on OCGA § 16-2-2: "A person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence."

Logically, the jury could have rejected this defense and still acquitted defendant based on the State's failure to prove proximate cause beyond a reasonable doubt. Criminal negligence could be found in defendant's intentionally driving under the influence of alcohol to the extent it was less safe for him to drive, even if the victim's death was accidental and not proximately caused by the defendant.[8]

3. Evidence supported a finding that the victim's death resulted from an unavoidable accident. But evidence also supported a fault-based finding. The jury could have found that Miller was operating his vehicle while under the influence of alcohol to the extent it was less safe for him to drive. If this were so, obviously his reaction time would have been slower than it otherwise would have been. The evidence also authorized findings that Miller failed to take evasive action to avoid hitting Stachur and that he was violating the rules of the road by failing to activate his high-beam headlights.[9] It was for the jury to determine whether, in the absence of the above factors, the decedent's death could have been avoided. Construed in a light most favorable to the verdict, the evidence was sufficient to authorize a rational trier of fact to find defendant guilty of first degree vehicular homicide beyond a reasonable doubt.[10]

4. Unfortunately, the court erred by not recharging the jury on the issue of proximate cause.

---

[6] *Cain v. State*, 55 Ga. App. 376, 381-382 (190 SE 371) (1937).
[7] Id. at 382.
[8] See *Trippe v. State*, 73 Ga. App. 322, 323 (1) (36 SE2d 121) (1945).
[9] See OCGA §§ 40-8-20; 40-8-31.
[10] *Scott v. State*, 230 Ga. App. 522, 524 (1) (496 SE2d 494) (1998).

During deliberations, the jury sent a note to the court posing the following question: "If we determine that the defendant was in fact DUI, then is he guilty of counts 1 or 2 by virtue of the fact that it is being determined that he was DUI. (Space) Need clear explanation of reasonable doubt."

In answering the second inquiry, the court proposed to re-read the charges on presumption of innocence, burden of proof and reasonable doubt. As to the first, the court proposed simply to re-read the statutory definition of homicide by vehicle in the first degree without redefining DUI. Miller requested the jury also be recharged on proximate cause, to wit: "and that the State has the burden of proving beyond a reasonable doubt that defendant's conduct of driving under the influence was in fact the proximate cause of the victim's death." The court gave this instruction during its general charge immediately following the separate charge that "the State has the burden of proving beyond a reasonable doubt that the defendant is guilty of driving under the influence." No clarification was given of the legal term "proximate cause." As to the recharge, no additional explanatory instructions were requested or given.

The prosecuting attorney objected to the request on recharge on the ground this would confuse the issues. The court responded that "[i]t's not an unreasonable request . . . but it's sort of a defendant beneficial charge. Once I start giving defendant beneficial charges, I start getting some — I think to be fair — I need to start giving some State beneficial charges. And I think I'll just stick with what I said I would do." The court then asked if there was anything else desired by either party, which was responded to in the negative, and the jury returned.

The court cautioned the jury not to emphasize the recharge but to take the recharge together with the charge "as a whole, as one body of law applicable to the case." In the recharge, the court then instructed the jury that

> [a] person who, without malice aforethought, causes the death of another person, through the violation of Code Section 40-6-391, commits the offense of homicide by vehicle in the first degree. Code Section 40-6-391 is the code section which defines the offense of driving under the influence of alcohol. No person shall be convicted of any crime unless and until each element of the crime is proven beyond a reasonable doubt. The burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable doubt.

The jury's first question was whether the defendant could be convicted of vehicular homicide based solely on a finding that he violated the DUI statute. The court's recharge of the vehicular homicide statute without more only repeated what the jury had already been told and had not understood. The significance of causation as the connecting link, causation in the legal sense of proximate cause, was not explained.

> [W]hen the jury requests the court to recharge them on any point, it is the court's duty to do so. It is further the obligation of the court to instruct the jury in plain, clear language. Even when the charge relies on the exact language of the law, it must be calculated to enlighten rather than confuse the jury.[11]

Miller asserted essentially two defenses. One was that he had not violated the DUI statute, in that the detected intoxication was brought about after the collision. The other defense was that his conduct was not, in any event, the proximate cause of the victim's death. The court's recharge may have left the jury with the "mistaken notion that a defendant's intoxicated driving need only be *a* cause or an indirect cause [of the victim's death],"[12] since the vehicular homicide statute does not by its express terms employ the term or embrace the concept of proximate cause. At worst, the recharge may have had the effect of depriving Miller of a major defense. At best, it was confusing. The court's admonition to the jury to interpret the recharge and general charge as a whole did not eliminate the confusion, because the recharge was merely a repetition of part of the original charge and the jury showed by its request for additional instructions that it did not comprehend the general charge on this pivotal particular. For the foregoing reasons, the court's refusal to recharge the jury on proximate cause constituted harmful error requiring the grant of a new trial.[13]

5. As there was no evidence Miller was speeding, the trial court did not err in refusing to give his request to charge the jury on speeding as a predicate to the lesser included offense of second degree

---

[11] (Citations and punctuation omitted.) *Kimmel v. State*, 261 Ga. 332, 334-335 (3) (404 SE2d 436) (1991).

[12] (Emphasis in original.) *Mote v. State*, 212 Ga. App. 551, 554 (2) (442 SE2d 799) (1994) (Beasley, P. J., concurring specially).

[13] See *Herrin v. State*, 229 Ga. App. 260, 262 (2) (493 SE2d 634) (1997) (when jury requests additional instructions upon a particular phase of the case, court is under a duty to instruct them in a manner so as to enlighten rather than confuse them); *Fowler v. Gorrell*, 148 Ga. App. 573, 577 (2) (b) (251 SE2d 819) (1978) (where the trial court fails to give the benefit of a theory of the defense sustained by the evidence, a new trial must be granted).

vehicular homicide under OCGA § 40-6-393 (b).

6. Nor did the court err in denying Miller's motion to suppress the blood test results, as the evidence authorized a reasonable juror to find that the collision occurred sometime after 2:00 a.m. and that the blood test was administered at or about 5:00 a.m. and thus within three hours after Miller had driven his car.[14] The jury was not compelled to find that the alcohol consumption occurred after the collision. This issue is not moot given the unresolved question of whether the results of the blood test would be admissible at any retrial.

7. The remaining issues are moot.

*Judgment reversed. Pope, P. J., and Ruffin, J., concur.*

DECIDED FEBRUARY 22, 1999 —
RECONSIDERATION DENIED MARCH 9, 1999 — ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Raymon D. Burns*, for appellant.
*Daniel J. Porter, District Attorney, John S. Melvin, Assistant District Attorney*, for appellee.

---

[14] OCGA § 40-6-391 (a) (5) states: "A person shall not drive or be in actual physical control of any moving vehicle while: The person's alcohol concentration is 0.10 grams or more at any time within three hours after such driving or being in actual physical control from alcohol consumed before such driving or being in actual physical control ended."